Gregory K. Mueller
LAW OFFICES OF GREGORY K. MUELLER, P.C.
26 Franklin St.
Tenafly, NJ 07670
201.567.4969

Andre K. Cizmarik
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue
New York, NY 10022
212.308.4411

Attorneys for Respondent Minmetals, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
---------------------------------------- X
                                         :
DRAGON BOOM LIMITED,                     :    Case No. 13-cv-03072-KSH-CLW
                                         :
            Petitioner,                  :    Hon. Katharine S. Hayden
                                         :
      -against-                          :
                                         :
MINMETALS, INC.,                         :
                                         :
            Respondent.                  :
---------------------------------------- X

## RESPONDENT MINMETALS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER DRAGON BOOM LIMITED'S PETITION TO CONFIRM A FOREIGN ARBITRAL AWARD

## TABLE OF CONTENTS

                                                                                                                  **Page**

PRELIMINARY STATEMENT ..................................................................................... 1

FACTS ............................................................................................................................ 4

ARGUMENT ................................................................................................................ 12

    I.     MINMETALS FULLY SATISFIED THE CIETAC AWARD; THUS, DRAGON BOOM'S PETITION TO CONFIRM THAT AWARD MUST BE VACATED, LEST IT RECEIVE A DOUBLE RECOVERY .......................... 12

    II.    ALTERNATIVELY, THE CIETAC AWARD IS VOID BECAUSE THE UNDERLYING CONFLICT BETWEEN THE PARTIES WAS NOT ARBITRABLE, THE CIETAC PROCEEDINGS DENIED MINMETALS DUE PROCESS, AND THE CIETAC PANEL WAS DEFRAUDED BY DRAGON BOOM AND DANG MIN ................................................................ 14

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.,
　415 F. Supp. 133 (D.N.J. 1976) ............................................................................ 15, 16

Catz American Co. v. Pearl Grange Fruit Exchange, Inc.,
　292 F. Supp. 549 (S.D.N.Y. 1968) .............................................................................. 16

China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.,
　334 F.3d 274 (3d Cir. 2003) .................................................................................. 14, 15

First Options of Chicago, Inc. v. Kaplan,
　514 U.S. 938 (1995) ..................................................................................................... 14

SEC v. Antar,
　15 F. Supp. 2d 477 (D.N.J. 1998) ................................................................................. 1

**OTHER AUTHORITIES**

Federal Rule of Evidence 901 ............................................................................................. 1

Federal Rule of Evidence 902(3) ........................................................................................ 1

Federal Rule of Evidence 604 ............................................................................................. 1

Respondent Minmetals, Inc. ("Minmetals") submits this memorandum of law in opposition to petitioner Dragon Boom Limited's ("Dragon Boom") petition for an order confirming a foreign arbitral award.

## PRELIMINARY STATEMENT

It is ironic that Dragon Boom should accuse Minmetals of "sleight-of-hand" (Docket No. 15), where it perpetrated a fraud on CIETAC and courts in New Jersey, and where it seeks, by continuing to maintain its petition to confirm a foreign arbitral award, a double recovery. To wit: Dragon Boom's counsel <u>admits</u> that Minmetals fully satisfied an arbitral award rendered against it, and in favor of Dragon Boom, by the China International Economic and Trade Arbitration Commission (the "CIETAC Award" [1]), in the amount of $2.95 million; yet it comes to this Court seeking a pure windfall – another chance to enforce the already-paid award.[2]

Dragon Boom attempts to justify this petition not on the basis of any legal theory, but because it feels duped. It was not. Indeed, it was CIETAC that was duped by Dragon Boom's fraud. As Dragon Boom expressly acknowledges, Minmetals wired $2.95 million into a bank

---

[1] "CIETAC Award" refers to the arbitral decision and award rendered by CIETAC, which award Dragon Boom seeks to confirm in this action. A true and correct copy of a certified English translation of the CIETAC Award is annexed as Exhibit A to the Declaration of Andre K. Cizmarik, dated August 9, 2013, submitted in opposition to Dragon Boom's petition to confirm ("Cizmarik Decl."). It should be noted that the translation that Dragon Boom submits in support of its petition (Docket No. 1, Ex. 4), is not certified by a particular individual as being a true and correct translation. Thus, Minmetals disputes its authenticity and admissibility. SEC v. Antar, 15 F. Supp. 2d 477, 533 n.15 (D.N.J. 1998) ("the foreign documents are unauthenticated and uncertified, in violation of Rules 901 and 902(3) of the Federal Rules of Evidence. Moreover, there is no indication from the defendants as to who may have prepared the purported translation of the documents into English, or whether the translator is qualified. See Federal Rule of Evidence 604.")

[2] Although the arbitral award had not yet been satisfied at the time of the filing of the petition, it has since been satisfied, and despite requests by Minmetals, Dragon Boom refuses to withdraw its petition.

account of Dragon Boom's choosing, pursuant to an Enforcement Agreement between the parties, which the parties agreed would end any enforcement with respect to the CIETAC Award. In or around the same time Minmetals made this payment, it exercised its legal rights in a separate action in Hong Kong and requested that said bank account be frozen. Dragon Boom was fully aware that there were claims made against it in a New Jersey State court proceeding, and it either understood or should have understood that, in connection therewith, any of its assets – including those transferred to it pursuant to the Enforcement Agreement – could be subject to pre-judgment attachment. Moreover, Dragon Boom had every opportunity to insist upon on a provision in the Enforcement Agreement wherein Minmetals would waive its right to attach funds paid to satisfy the CIETAC Award. It did not. Dragon Boom cannot now be heard to complain that Minmetals has taken perfectly legal action to protect and enforce its rights in a separate proceeding.

In any event, despite the fact that the money is "frozen," Dragon Boom still possesses and owns that money. Minmetals relinquished any and all control of the money when it was wired out of its account. Likewise, the bank that holds the frozen funds does so for the benefit of Dragon Boom. Should the freeze be lifted, Dragon Boom will have full access to the money and any interest accrued thereon. Any funds it seeks to recover as a result of this petition, then, would amount to a double recovery. Conversely, should Minmetals be deemed entitled to the frozen funds as the result of a decision in a separate proceeding, only then would it receive the money. But regardless of who, ultimately, is entitled to the funds in the frozen account, the fact of the freeze does not, somehow, entitle Dragon Boom to any additional funds. Thus, to confirm the CIETAC Award here would serve only to enable Dragon Boom to obtain a double recovery. Stated differently, the money Minmetals paid to Dragon Boom in satisfaction of the CIETAC

Award does not have any special immunity: it is subject to the claims of any other party in any other legal proceeding. That it was caused to be frozen (i) in close temporal proximity to its transfer, (ii) by the entity that made the transfer, is of no legal significance.

Alternatively, if this Court does not deem the petition to be moot, it should deny Dragon Boom's petition on the basis that the dispute that gave rise to the CIETAC Award was not arbitrable in the first place. The Court of Appeals for the Third Circuit has made clear that a district court is obliged to independently determine the arbitrability of a dispute, even when an award has already been rendered by a foreign arbitral entity. Here, the record makes plain that Minmetals' counsel at the CIETAC arbitration objected to the arbitrability of the underlying dispute at every turn. He did so on two bases, presenting evidence in support of each.

First, the agreement upon which CIETAC based the CIETAC Award – a "Cancellation Agreement" that rendered moot two contracts between the parties for the sale of goods – contained no arbitration clause. Thus, the face of the Cancellation Agreement, at the very least, gives rise to a question of fact as to whether the parties intended to arbitrate.

Second, the Cancellation Agreement (and the two related sales contracts), were procured as a result of a fraud on Minmetals perpetrated via a conspiracy between, inter alia, Dragon Boom and a rogue employee of Minmetals. Specifically, evidence was presented before CIETAC that these agreements were executed, ostensibly on Minmetals' behalf, by the rogue employee, at Dragon Boom's and other conspirators' behest. Thus, even if the agreements would have formed the basis of an arbitrable dispute, there was sufficient evidence presented at the arbitration to suggest that they are void. One of these co-conspirators was Dang Min, who has gone to great lengths to deny any involvement with Dragon Boom or the agreements at issue, despite there being incontrovertible documentary evidence gleaned from documents recently

3

produced by HSBC Bank (and in any event, well after the CIETAC Award was issued), that (i) he was Dragon Boom's principal, director, and sole shareholder and (ii) he, personally, using Dragon Boom letterhead, requested a wire transfer be made to Minmetals in satisfaction of the sales contracts that were ultimately mooted by the Cancellation Agreement. These documents, alone, make plain that Dragon Boom committed fraud on the CIETAC arbitral body and that the CIETAC panel was never apprised of Dang Min's close relationship with Dragon Boom at the time it rendered its award. Had it been so apprised, the outcome of the arbitration should have been vastly different.

At the very least, then, this Court should order further proceedings before summarily confirming the CIETAC Award, in order to meet its obligation to independently evaluate the arbitrability of the underlying dispute.

## FACTS

On or about March 21, 2012, CIETAC rendered an arbitral award in Dragon Boom's favor and against Minmetals in the amount of approximately $2.5 million, plus interest and various costs, and fees.[3] (CIETAC Award at 25-26.) On or about July 5, 2013, the parties entered into an Enforcement Agreement, wherein Minmetals agreed to deposit $2.95 million into a specific account designated by Dragon Boom, which monies would fully satisfy the CIETAC Award. (Docket No. 15, Attachment #1.)[4] The parties acknowledged that "enforcement under the present case [i.e., the CIETAC Award] shall end immediately after [Minmetals] fully pays [the $2.95 million] into the designated bank account of [Dragon Boom]." Id. As set forth in the

---

[3] The CIETAC Award was rendered partially in United States Dollars, and partially in Chinese Yuan, making the precise amount of the award difficult to determine.

[4] For the Court's convenience, this document is annexed as Exhibit B to the Cizmarik Decl.

4

Enforcement Agreement, Minmetals did not make any admissions with respect to the validity of the CIETAC Award. See id.

On or about July 30, 2013, counsel for Dragon Boom expressly represented to this Court that Minmetals had, indeed "made the payment required by the Enforcement Agreement." (Docket No. 15.) In other words, Dragon Boom has admitted that Minmetals has fully satisfied the CIETAC Award. Minmetals did not satisfy CIETAC Award because it believed the award to be legitimate. Rather, as Dragon Boom's own counsel suggests, Minmetals did so "to forestall the possible foreclosure of" one of its factories, which was otherwise imminent due to Dragon Boom's enforcement efforts in China with respect to the CIETAC Award. (See Docket No. 15.)

The CIETAC Award was rendered after arbitration between the parties with respect to a dispute as to certain obligations under an agreement to cancel two contracts for the sale of goods. Specifically, on or about January 7, 2011, the parties purportedly entered into two contracts wherein Minmetals agreed to deliver certain rare earth metals to Dragon Boom in exchange for $2,488,000 (the "Rare Earth Contracts"). (Cizmarik Decl., Exs C & D.) The Rare Earth Contracts had identical arbitration clauses, which provided that "[a]ll disputes from or in connection with this Contract shall be submitted to China International Economic and Trade Commission for arbitration (CIETAC) which shall be conducted by the Commission in Beijing in accordance with the Commission's arbitration rules in effect at the time of applying for arbitration. The arbitral award shall be binding upon both parties." Id., Ex. C ¶ 13 & Ex. D ¶ 13.

About a month later, on or about February 15, 2011, the parties entered into a Cancellation Agreement with respect to the Rare Earth Contracts. (Cizmarik Decl., Ex. E.) Therein, Minmetals acknowledged that Dragon Boom had sent to its account a wire transfer of $2,478,000 for payment pursuant to the Rare Earth Contracts. The parties agreed that Minmetals

5

would return that money <u>and that the Rare Earth Contracts would be cancelled</u> – that is, the Rare Earth Contracts were a nullity, and Minmetals' obligation to deliver product to Dragon Boom would be extinguished. <u>Id.</u> Importantly, the Cancellation Agreement, which superseded and effectively voided the Rare Earth Contracts, had no arbitration clause. <u>See id.</u>

Despite the absence of any arbitration clause in the Cancellation Agreement, in or about April, 2011, Dragon Boom initiated arbitration proceedings before CIETAC in connection with Minmetals' alleged failure to perform – <u>i.e.</u>, refund Dragon Boom – pursuant to same. The CIETAC Award makes clear that it was rendered pursuant to the Cancellation Agreement, as opposed to the Rare Earth Contracts. Specifically, in the text of the CIETAC Award, the arbitration panel opined that the Cancellation Agreement was effective and that it was breached by Minmetals. Then, in making its award, it proceeded to calculate Dragon Boom's interest from the date by which Minmetals was allegedly required to "refund the whole payment to the bank and account of the Claimant specified in the 'Cancellation Agreement' . . . ." (CIETAC Award at 20, 23.) In other words, the CIETAC Award was based solely on the Cancellation Agreement, which, on its face, unambiguously did <u>not</u> contain an arbitration clause.

Before, during, and after the CIETAC arbitration, Minmetals' counsel advised the CIETAC panel that arbitration of the dispute was not proper because the Cancellation Agreement did not have an arbitration clause. (<u>See</u> Liu Decl.)[5] However, CIETAC summarily rejected counsel's argument. Id. ¶ 2

Minmetals' counsel separately raised before the CIETAC panel the issue that both the Rare Earth Contracts and the Cancellation Agreement were procured by fraud, engineered in part by Dragon Boom and a rogue employee of Minmetals, who signed the agreements, ostensibly on

---

[5] "Liu Decl." refers to the Declaration of Haiping Liu, dated August 8, 2013, submitted in opposition to Dragon Boom's petition to confirm.

6

for Minmetals, even though he had no authority to sign these types of contracts on Minmetals' behalf. (See Cizmarik Decl., Ex. F.) Now, there is even stronger evidence that a fraud was perpetrated. To wit, after the CIETAC Award was rendered, it became apparent that Dang Min, a defendant in the state court action involving the very same agreements,[6] has made several demonstrably false representations in that action in an apparent attempt to distance himself from both Dragon Boom, generally, and the Rare Earth Contracts, specifically. Significantly, Dragon Boom engaged in fraud by affirmative representations in failing to advise both CIETAC and the New Jersey State Court that Dang Min was the Director and sole shareholder of Dragon Boom.[7] For example:

---

[6] Minmetals v. Dragon Boom, Ltd., Docket No. C-71-12 (N.J. Super. Ct.) (the "State Action"). However, on June 19, 2013, the defendants removed that case to federal court and Minmetals filed a motion to remand, which is pending before Your Honor (2:13-CV-03838-KSH-CLW).

[7] We are not suggesting or intimating in any way that Dragon Boom's attorney in this case had any knowledge that Dragon Boom was actually owned by Dang Min. Perhaps Dang Min duped him as well. Regardless, when Dang Min made these false representations to the New Jersey State Court, Dragon Boom was under an affirmative obligation to disclose, and not perpetrate, this fraud. That Dragon Boom remained silent speaks volumes of its willingness to perpetrate fraud and raises serious questions about what information was intentionally withheld from the CIETAC panel by Dragon Boom.

| False Representations Made by Dang Min to the New Jersey State Court | Documents Evidencing that Dang Min and Dragon Boom Made False Representations (and to which CIETAC did not have access) |
|---|---|
| Dang Min submitted a certification wherein he swore that he was not an agent, officer, director, shareholder, or key employee of Dragon Boom. (Cizmarik Decl., Ex. G ¶ 12.)<br><br>In response to an interrogatory requiring that he identify "any connection and/or relationship" between himself and Dragon Boom, Dang Min certified only that he "knew Mr. Geng Hai,"[8] Dragon Boom's director. (Cizmarik Decl., Ex. H No. 33.)<br><br>In a response to a document demand, Dang Min claimed not to have any documents identifying himself as a shareholder, partner, director, officer, employee, member, or agent of Dragon Boom, from 2006 through the present. (See Cizmarik Decl., Ex. I No. 16.) | Dang Min executed a Declaration identifying himself as a director of Dragon Boom, having been appointed March 8, 2008. (Cizmarik Decl., Ex. J.)<br><br>In connection with opening a bank account in Dragon Boom's name in or about April, 2008, Dang Min identified himself as the principal shareholder of Dragon Boom, the owner of 100% of the shares of Dragon Boom, a director of Dragon Boom, and an "Authorised Signatory" on behalf of Dragon Boom. (Cizmarik Decl., Ex. K at 8-9, 12.) |
| Dang Min submitted an answer to an interrogatory wherein he certified that the only transactions he was involved in vis-à-vis Dragon Boom were "not relevant to this lawsuit." (Cizmarik Decl., Ex. H No. 25.) | Dang Min sent a January 31, 2011 wire transfer instruction on Dragon Boom letterhead requesting the transfer of $2,478,000 from Dragon Boom to Minmetals. (Cizmarik Decl., Ex. L.) This instruction was sent three weeks after the Rare Earth Contracts were entered into, for the same amount due under those contracts. |

That Dang Min (who Minmetals just discovered is Dragon Boom's sole shareholder and Director) appears willing to risk making obvious misrepresentations to a court in the face of incontrovertible evidence to the contrary suggests not only that he is unreliable, but also, that he

---

[8] By way of brief background, Geng Hai has claimed to be the sole director and shareholder of Dragon Boom throughout discovery in the State Action. Furthermore, Dang Min has never disclosed his ownership of Dragon Boom stock or his role as the sole director of Dragon Boom at any time during discovery.

8

has reason to hide the truth, i.e., that the Rare Earth Contracts (and by extension, the Cancellation Agreement) were not entered into legitimately.

In addition to his previously concealed role in Dragon Boom, Dang Min has admitted to involvement with each of the corporations that Minmetals has alleged conspired with Dragon Boom to defraud Minmetals. In his answers to interrogatories in the State Action, Dang Min admitted that since 1999 he has been the Vice President and Director of B&H American, Inc. (Cizmarik Decl., Ex. H Nos. 6 & 7.) However, Dang Min contradicted this representation in a September 26, 2012 Certification, wherein he represented that he was President of B&H American, Inc. Id., Ex. G ¶ 1. He also admitted to being the Vice President of United Resources USA, Inc. since 1998, as well as a Director of same. Id., Ex. H Nos. 6 & 7. United Resources' answers to interrogatories in the State Action indicate that Dang Min is also one of its shareholders. Id., Ex. M No. 18. Dang Min also acknowledges involvement in Gary International Holdings, Ltd: namely, he is a "minority shareholder"[9] and director. Id., Ex. O No. 17. CIETAC never had the opportunity to consider these facts.

Dragon Boom intentionally withheld the identity of its shareholders, directors, and officers from Minmetals and the CIETAC Arbitration panel in furtherance of the co-conspirators' scheme. Full production of Dragon Boom's corporate documents would have disclosed that Dang Min was the sole shareholder of Dragon Boom. On April 21, 2011, counsel for Minmetals requested from counsel for Dragon Boom corporate registration documents for Dragon Boom that would evidence the latter's existence. (Cizmarik Decl., Ex. P.) Thereafter, Dragon Boom refused to produce its corporate documents. On July 29, 2011, Minmetals sought to file a counterclaim, alleging that Dragon Boom: (i) has failed to produce its corporate

---

[9] On the date of incorporation, Dang Min owned 24 of the 97 shares of stock in Gary. (Cizmarik Decl., Ex. N.)

9

documents, including its registration information; (ii) did not appear to be registered in either Hong Kong or the British Virgin Islands; and (iii) had reported a fabricated corporate address to CIETAC. Id., Ex. Q. On August 18, 2011, Dragon Boom's counsel responded by submitting limited corporate documents that failed to identify the shareholders, directors, or officers of Dragon Boom. See id., Ex. R.) The omissions by Dragon Boom are further apparent in the CIETAC Award, which omit the identities of shareholders, directors and officers, and merely reference two business managers authorized to transact business on behalf of Dragon Boom. (See CIETAC Award at 18.)

In any event, the CIETAC Award acknowledged that Minmetals "requested the arbitral tribunal to directly conduct authentication . . ." regarding the rogue employees' authorization to sign the Rare Earth Contracts and Cancellation Agreement. (CIETAC Award at 22-23.) However, "the arbitral panel refused to consider this issue." (Cizmarik Decl., Ex. F ¶ 3.) As Minmetals' counsel in the CIETAC proceeding explained:

> During the arbitration hearing, there was <u>not</u> a full and fair opportunity to raise and litigate the issue of the fraudulent behavior engaged in by Dragon Boom in collaboration with defendant [rogue employee]. . . . One reason is because the arbitration was conducted under the authority of the China International Economic and Trade Commission, whose <u>focus was solely on the contractual obligations between Dragon Boom and Minmetals</u>. . . . The proceedings also did not allow a sufficient opportunity for completion of an investigation for the purpose of proving fraud in the execution of the contracts, nor did it consider that a claim of fraud would have invalidated any authority by a corrupted employee to execute a valid contract.

Id. ¶ 4 (emphasis added). The Judge in the State Action, the Honorable Hector Velazquez, agreed, observing, in conjunction with his Opinion denying Dragon Boom's (and other defendants') motion to dismiss, that:

10

> My review of the record demonstrates that the claims asserted
> against the moving defendants [including Dragon Boom] in the
> amended complaint were not fully or fairly litigated in the
> CIETAC arbitration. . . . The arbitrators did not address any of the
> fraud or conspiracy claims raised in [Minmetals'] amended
> complaint . . . . There is also nothing in the record to suggest that
> [Minmetals] was afforded the opportunity to expand the scope of
> the arbitration to include claims against any of the moving
> defendants [i.e., Dragon Boom]. On the contrary, what the record
> does reveal is that when Minmetal's [sic] attorney attempted to
> raise the fraud and conspiracy issue, the arbitration panel refused
> to consider it.

(Cizmarik Decl., Ex. S.) In other words, it appears that the CIETAC panel operated under the assumption that the dispute was arbitrable, while ignoring its obligation to conduct an independent analysis of its own, and also while ignoring the obvious fact that the Cancellation Agreement – the very subject of the arbitration – did not contain an arbitration clause. Furthermore, it did not even have the opportunity to consider some of the strongest evidence of fraud, i.e., Dang Min's inexcusable misrepresentations and omissions in the State Action, which have only recently come to light.

Judge Velazquez further ordered the parties to complete discovery before requesting an evidentiary hearing to determine whether valid agreements to arbitrate exist. (Cizmarik Decl., Ex. S.) Dragon Boom did not participate in complete discovery, but rather filed the instant matter in an attempt to circumvent Judge Velazquez's Order. Minmetals cited numerous deficiencies in Dragon Boom's answers to interrogatories and responses to document demands (Cizmarik Decl., Ex. T), yet the latter has failed to remedy these deficiencies. Additionally, Dragon Boom has balked at producing witnesses for deposition, citing logistical inconveniences. (See Cizmarik Decl., Ex. U at 21.) Thereafter, the parties agreed to adjourn depositions pending two foreign defendants (Hangzhou Baohang Industrial Investment Group, Ltd. and Li Zheng) joining issue. Prior to either appearing, Dragon Boom initiated the instant action. Thus, Dragon

11

Boom cannot credibly claim that discovery has been completed before seeking a judicial determination as to the validity of the arbitration clauses in the underlying contracts.

In short, Minmetals' attorney raised two issues before CIETAC, both directly concerning whether the dispute that gave rise to the CIETAC Award was even arbitrable: (1) the Cancellation Agreement, pursuant to which Dragon Boom brought the arbitration, had no arbitration clause, and (2) the Cancellation Agreement and Rare Earth Contracts were void, having been procured by fraud. CIETAC failed to seriously consider these issues, content to render its award without adequately exploring either, despite acknowledging that they had access to the Cancellation Agreement and were presented evidence by Minmetal's counsel regarding the fraud claim.

## ARGUMENT

### I. Minmetals Fully Satisfied the CIETAC Award; Thus, Dragon Boom's Petition to Confirm That Award Must be Vacated, Lest it Receive a Double Recovery

Dragon Boom's counsel admits that Minmetals fully satisfied the CIETAC Award by wiring $2.95 million into an account of Dragon Boom's choosing. Now, because that account is frozen as a result of an attachment effected by Minmetals in connection with a separate litigation in Hong Kong, Dragon Boom argues that it is entitled to a confirmation of that award, presumably so it can attempt to enforce the award in New Jersey. To the extent Dragon Boom is successful, it stands to gain a massive windfall.

There is no doubt that Dragon Boom owns the $2.95 million. Minmetals certainly no longer has possession, title, dominion, control, or access to it. Nor does Dragon Boom's bank have any right to the money – it holds those funds solely for the benefit of Dragon Boom. Assuming the freeze is dissolved by the Hong Kong court, Dragon Boom will have full access to the $2.95 million, plus any interest that has accrued thereon in the interim. If, in connection with

12

its petition, Dragon Boom obtains a judgment from this court of approximately $2.7 million (see Docket No. 1 at 7), it will stand to gain nearly twice as much as it was entitled to pursuant to the CIETAC Award. On the other hand, in the event that Minmetals prevails on its fraud and RICO claims against Dragon Boom, Minmetals will be entitled to the $2.95 million, which has been frozen to prevent it from being dissipated. Minmetals' attempt to assert its rights in the Hong Kong action cannot serve as an invitation for Dragon Boom to double dip with respect to the CIETAC Award.

In recent correspondence to this Court, Dragon Boom attempts to make much of the fact that the freeze was instigated by Minmetals, nearly contemporaneously with its satisfying the CIETAC Award. However, Dragon Boom will be hard-pressed to point to any authority supporting the proposition that this has any legal significance – Minmetals is not aware of any such authority that exists. Analytically, then, this situation is no different from a scenario in which Minmetals satisfied the CIETAC Award, and then, months or years later, a non-party to the arbitration obtained an attachment on the bank account in which that award was deposited. Confirming the CIETAC Award in that instance would be absurd. Dragon Boom cannot explain why this situation is, as a matter of law, any different. Likewise, Dragon Boom's suggestion that Minmetals would not have satisfied the CIETAC Award but for its ability to effect the freeze (See Docket No. 15), has no legal significance. Minmetals fully complied with its obligations under the Enforcement Agreement and did, in fact, satisfy the CIETAC Award. Further, Dragon Boom cannot claim complete ignorance as Minmetals' intentions; on April 11, 2013, counsel for Minmetals alerted Judge Velazquez during a case management conference that Minmetals intended to file a motion for prejudgment attachment of the domestic assets of the defendants in the State Action. (Cizmarik Decl., Ex. U at 38.) To the extent that Minmetals also availed itself

of protections afforded to it under Chinese law is irrelevant to the issue of whether Dragon Boom received, and is the legal owner of, the money.

## II. Alternatively, the CIETAC Award is Void Because the Underlying Conflict Between the Parties was not Arbitrable, The CIETAC Proceedings Denied Minmetals Due Process, and the CIETAC Panel was Defrauded by Dragon Boom and Dang Min

As Dragon Boom acknowledges, this proceeding "arises under The Convention on the Recognition and Enforcement of Foreign Arbitral Awards" (Docket No. 1 ¶ 3), and it is well-settled in this Circuit that "a district court should refuse to enforce an arbitration award under the Convention where the parties did not reach a valid agreement to arbitrate . . . ." China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274 (3d Cir. 2003); see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration"). Indeed, this Court's authority to determine arbitrability is broad, and "must" be exercised "unless the parties clearly and unmistakably have agreed that the arbitrator should decide arbitrability." 334 F.3d at 281 (citing 514 U.S. at 943). The arbitrability of the underlying dispute is clear – there was never an agreement to arbitrate. Furthermore, given the factual issues presented by Minmetals' counsel at the CIETAC arbitration regarding fraud, this Court, at the very least, should deny Dragon Boom's petition and order further proceedings to explore this issue. In fact, in an opinion in the State Action, Judge Velazquez noted that challenges to a contract signor's power or authority to make a contract (such as the challenges Minmetals' counsel made at CIETAC), "must be decided by the court," as opposed to the arbitrator, and that further discovery was appropriate prior to an evidentiary hearing to "determine whether valid agreements to arbitrate exist." (Cizmarik Decl., Ex. S.)

14

In China Minmetals, the Third Circuit vacated the District Court's confirmation of an arbitral award rendered by CIETAC where the respondent had, during the arbitration, "repeatedly objected to the CIETAC's jurisdiction." Id. at 278. Specifically, respondent had argued at the arbitration that the contracts giving rise to the dispute (and allegedly providing for arbitration) had been forged. See id. at 277. It had proffered evidence to the District Court in support of this argument, in response to which petitioner produced documentation tending to show that the contracts were valid. Noting that it "seems clear that international law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a dispute, at least where the challenging party claims that the contract on which the tribunal rested its jurisdiction was invalid," the Third Circuit remanded the case to the district court "for further proceedings to ascertain the validity of the contracts." Id. at 289-90. It did so despite the fact that respondent had fully participated in the arbitration, because respondent had "continually objected to the arbitration panel's jurisdiction." Id. at 285.

The instant case cannot be more similar. As discussed at length in the Facts, supra, Minmetals repeatedly objected to CIETAC's jurisdiction before, during, and after the arbitration that gave rise to the CIETAC Award. It argued both that the underlying agreement did not have an arbitration clause, and that it (as well as related agreements) was procured by fraud, and thus void.

Additionally, Dragon Boom intentionally withheld evidence of Dang Min's role in its corporate structure, thereby precluding Minmetals from identifying his complicity in the conspiracy with sufficient time to supplement its claims of fraud before the CIETAC panel. Under Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co., 415 F. Supp. 133, 137 (D.N.J. 1976), "fraud, even though not one of the defenses enumerated in

15

Article V of the Convention (FAA), became a defense through the incorporation provision of 9 U.S.C.S 208." In order to set aside a final judgment on grounds of fraud, it must appear that such a fraud precluded the claiming party from making a full and fair defense. Catz American Co. v. Pearl Grange Fruit Exchange, Inc., 292 F. Supp. 549 (S.D.N.Y. 1968). The U.S. District Court for the District of New Jersey has applied the Catz American holding to arbitration awards as well. Biotronik Mess-Und Therapiegeraete, supra, 415 F. Supp. at 138. In this matter, Dragon Boom's failure to disclose Dang Min's control of Dragon Boom to Minmetals and CIETAC was part of an ongoing pattern of misrepresentations, as is evidenced supra. The material omissions of Dragon Boom and Dang Min denied Minmetals the ability to present a full and fair defense before CIETAC.

CIETAC hardly considered Minmetals' arguments with respect to fraud; limited Minmetals' ability to conduct discovery, implead parties, and assert affirmative defenses; and did not have access to some of the strongest evidence, due to malfeasance by Dragon Boom and Dang Min. These procedural omissions at CIETAC lead to Judge Velazquez's finding that Minmetals did not have an adequate opportunity to obtain a full and fair adjudication before CIETAC. (Cizmarik Decl., Ex. S.) Third Circuit jurisprudence requires this Court to consider that which CIETAC obviously ignored or did not have the opportunity to consider.

## CONCLUSION

For the reasons set forth above, Minmetals respectfully requests that this Court deny Dragon Boom's petition for confirmation of the CIETAC Award either as being moot, or as being inappropriate due to the fact that the underlying dispute was not properly subject to arbitration. In the alternative, this Court should deny Dragon Boom's petition at this time and order further proceedings to determine the arbitrability of the underlying conflict.

Dated: Tenafly, NJ
      August 9, 2013

*/s/ Andre K. Cizmarik*
Gregory K. Mueller
LAW OFFICES OF GREGORY K. MUELLER, P.C.
26 Franklin St.
Tenafly, NJ 07670
201.567.4969

Andre K. Cizmarik
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue
New York, NY 10022
212.308.4411

Attorneys for Respondent Minmetals, Inc.

AM 20424605.3